1

```
 1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
 2                  NORTHERN DIVISION AT COVINGTON


 3
       UNITED STATES OF AMERICA,  :  Docket No. CR 09-35
 4                                :
                 Plaintiff,       :  Covington, Kentucky
 5                                :  January 13, 2010
            versus                :  9:00 a.m.
 6                                :
       KENNETH L. MULLIKIN, JR.,  :
 7                                :
                 Defendant.       :
 8
                                  - - -
 9
                       TRANSCRIPT OF SENTENCING
10                     BEFORE DANNY C. REEVES,
                 UNITED STATES DISTRICT COURT JUDGE
11
                                  - - -
12     APPEARANCES:

13

14     For the United States:      JASON A. DENNEY, ESQ.
                                   U.S. Attorney's Office
15                                 207 Grandview Drive
                                   Suite 400
16                                 Ft. Mitchell, KY 41017-2762

17      For the Defendant:         F. DENNIS ALERDING, ESQ.
                                   Alerding Law Office
18                                 303 Greenup Street
                                   Suite 300
19                                 Covington, KY 41011

20     Court Reporter:            JOAN LAMPKE AVERDICK, RMR-CRR
                                   Official Court Reporter
21                                 35 W. Fifth Street, Box 1073
                                   Covington, KY 41012
22                                 (859) 291-9666

23

24

25          Proceedings recorded by mechanical stenography,
       transcript produced by computer.
```

2

1           (Proceedings commenced at 9:00 a.m.)

2           THE COURT:  Madam Clerk, if you could call the matter

3    scheduled for 9:00, please.

4           THE CLERK:  Covington criminal 09-35, United States

5    of America versus Kenneth Lester Mullikin, Junior.

6           THE COURT:  Thank you.  If counsel could state their

7    appearances for the record.

8           MR. DENNEY:  Jason Denney for the United States, Your

9    Honor.

10          THE COURT:  Thank you.

11          MR. ALERDING:  Dennis Alerding for Mr. Mullikin, Your

12   Honor.

13          THE COURT:  Thank you.  And this is Mr. Mullikin here

14   at counsel table?

15          MR. ALERDING:  It is.

16          THE COURT:  Thank you.  This matter is scheduled for

17   sentencing hearing this morning.

18          MR. ALERDING:  Judge, Mr. Mullikin indicated to me

19   that he was unable to hear Your Honor.

20          THE COURT:  All right.  Madam Clerk, if you could

21   turn up the microphone just a bit, please.

22          MR. ALERDING:  Thank you, sir.

23          THE COURT:  All right.  This matter is scheduled for

24   a sentencing hearing this morning.  Before we proceed with the

25   hearing, let me first confirm that Mr. Mullikin has received a

1       copy of his presentence report, that he's had the opportunity

2       to review his report and discuss it with his counsel.  Is that

3       correct?

4                   THE DEFENDANT:  Yes, Your Honor.

5                   THE COURT:  Mr. Mullikin, your presentence report

6       will be placed in the file under seal, pursuant to Rule 32.

7       It is available if you should need it for any reason or if the

8       attorneys should need it for any reason, but it's not

9       available to the general public.

10                  There are a number of objections that I will ask the

11      attorneys to address in just a moment.  I also understand that

12      the defendant wishes to present some testimony.  I'm not sure

13      if the testimony would impact the objections that have been

14      raised, and so let me ask counsel at this time if you wish to

15      present your testimony before or after addressing the

16      objections in the case?

17                  MR. ALERDING:  Your Honor, actually, we can do the

18      objections now.

19                  THE COURT:  All right.  That's fine.

20                  MR. ALERDING:  Judge, actually, I don't know that I

21      have anything to add beyond what -- I guess these objections

22      were filed by Ms. Cross.

23                  THE COURT:  Yes, sir.

24                  MR. ALERDING:  I don't know that I have much to add.

25      The objections appeared to me that the -- well, some of them

4

1    appear to be dealt more with conclusory issues.  I think

2    objection to number 5, I guess at page 5, paragraph 10, I

3    don't know really how we'd address that objection.  I think

4    there's an issue here that Mr. Mullikin wanted to add language

5    that he never specifically requested materials.  You know,

6    I -- from my point of view, I think that's relevant to whether

7    that's mitigated -- I think that's a mitigating factor on his

8    behalf.  I don't know how we can add that into the PSI

9    because --

10              THE COURT:  Well, I suppose --

11              MR. ALERDING:  -- because there's no evidence either

12   way.  I mean, there's no evidence that he was casting about

13   asking for things, but the fact that he had it is what -- is

14   the meat of the charge.

15              THE COURT:  Um-hmm.  There was not an enhancement

16   applied in the case under 2G2.2(b)(3)(B).  In other words,

17   there was not an enhancement for distribution or receipt, or

18   expectation of receipt of a thing of value but not for

19   pecuniary gain.  And that often applies in cases in which an

20   individual's found to have obtained pornographic material on

21   this web site LimeWire.

22              MR. ALERDING:  Yes, sir.

23              THE COURT:  But that didn't apply here.  That

24   enhancement wasn't applied here.  And so I'm not sure that it

25   really is a factor for the Court to consider.  It's not -- it

5

1    doesn't affect the guideline calculations; but, of course, the

2    defendant's position is certainly noted in the record through

3    the addendum, so I'm not sure that it requires a ruling from

4    the Court.

5           With respect to the other two objections that are

6    enumerated in the addendum as objection number 14 and 15, one,

7    as you say, is just the generic argument of whether there are

8    or are not mitigating factors.

9           There are two issues, really.  One would be a

10   departure issue under the guidelines.  And the Court does not

11   believe that there's any -- there's sufficient proof in the

12   presentence report for the Court to apply a departure for

13   psychological or emotional issues under 5H1.3.  But that was

14   really the response from the probation officer, that that

15   might be the issue that was being referenced through the

16   objection.

17          And the final objection is objection enumerated as

18   number 15 of whether factors under Title 18, section 3553,

19   that might warrant essentially a variance.  And I do need to

20   certainly consider all the information that will be presented

21   in the hearing before I can make a final determination as to

22   that issue.  That's the ultimate issue for the Court to

23   determine.  But I don't think that issue necessarily relates

24   to the guidelines, but if the parties wish to make any further

25   arguments on those points, I'll certainly entertain those.

6

1        Mr. Denney, did you have anything further to add with
2   respect to the objections?
3        MR. DENNEY:  No, Your Honor, other than to simply
4   note that that's apparently the defendant's position.  Along
5   the same lines, though, I should point out that the United
6   States may want to wait to make any motions regarding
7   acceptance of responsibility until we see how it plays out --
8        THE COURT:  All right.
9        MR. DENNEY:  -- regarding that issue of requesting
10  material and knowingly receiving those materials.
11       THE COURT:  All right.  Well, let me -- we'll go
12  ahead and I'll -- we'll go to the issue of proof to be
13  presented, then I'll go to these guidelines after I've heard
14  the parties' position with respect to those matters, and then
15  I'll then turn to the guideline calculations at that point.
16       MR. ALERDING:  Thank you, Your Honor.
17       THE COURT:  Let's see.  Mr. Alerding, I believe that
18  you have under subpoena two witnesses that you wish to call?
19       MR. ALERDING:  I did, sir, and they are present.  I'd
20  call Dr. Edwin Larson.
21       THE COURT:  Thank you.
22       MR. DENNEY:  United States would invoke the rule of
23  separation.
24       THE COURT:  All right.  The rule on separation of
25  witnesses has been invoked.  Any person that anticipates being

Larson - Direct

7

1    called as a witness in the matter, other than the parties or

2    the United States' designated case agent, they would be

3    required -- would be excluded from the courtroom at this time

4    and would not be able to discuss the testimony of any other

5    witness that does testify in the case.

6                MR. ALERDING:  My other witness has left the room.

7                THE COURT:  All right.  Thank you.

8             DEFENSE WITNESS, EDWARD LARSON, M.D., SWORN

9                COURT SECURITY OFFICER:  Your Honor, can we work from

10   the podium, or do you need --

11               THE COURT:  He'll need to come up to the witness

12   stand.  Thank you.  Thank you, Mr. Alerding.  You may proceed.

13               MR. ALERDING:  Thank you, sir.

14                        DIRECT EXAMINATION

15   BY MR. ALERDING:

16   Q.   Good morning, Dr. Larson.

17   A.   Good morning.

18   Q.   Doctor, for the record, can you state your name?

19   A.   Edwin Robert Larson.

20   Q.   And, Dr. Larson, how are you employed?

21   A.   I'm employed as a private practice physician in

22   psychiatry.

23   Q.   And where is that?

24   A.   It's in Montgomery.  It's 9200 Montgomery Road.  I have

25   my own office there.

1  Q.   And how -- how long have you been in practice?

2  A.   Oh, 32 or 33 years.

3  Q.   All right.  In the course of your practice, you came into

4  contact with Ken Mullikin?

5  A.   Yes, I have.

6  Q.   Okay.  Do you remember about when you first started -- or

7  when he started treating with you?

8  A.   June of last year.

9  Q.   All right.  And for how long have you seen him?

10  A.   I saw him until -- I saw him initially weekly or every

11  other week until he was arrested.  And then it was sporadic

12  after that because I ran into -- there was a sequence of

13  events -- I'm not sure -- went into alcohol rehabilitation,

14  and then was more sporadic after that.  We've had some contact

15  by phone and letter.

16  Q.   Well, what was it that he came to you for?

17  A.   I'm sorry?

18  Q.   Why did he come to see you?

19  A.   He had first came into the office with pretty typical

20  complaints about his marriage; that he was worried about it;

21  that he and his wife had been living together but somewhat

22  estranged, and he was -- then he told me some of the history,

23  the background of his marriage, that didn't sound very

24  favorable, but he was wanting to try.  So we talked about

25  that, as well as his relationship with his daughter and his

*Larson - Direct*

9

1    alcohol use, and -- and his job as well, the stresses and

2    strains of that job.  But mainly about his marriage, wanting

3    to repair it.

4    Q.   Okay.  Did he also discuss with you his legal problems,

5    the matter that brings him before the Court today?

6    A.   Not initially, no.  I didn't know about it until it

7    actually came to -- until he was arrested.

8    Q.   Until he was formally charged?

9    A.   Formally charged, yes.

10   Q.   Once you knew all those things, did you -- did you make

11   any formal diagnoses of him?

12   A.   Yes, I did.

13   Q.   What was that?

14   A.   Well, he had an alcohol problem.  I'm not sure if I could

15   call it alcoholism, but alcohol abuse, which it was fairly

16   longstanding.  He had a depression, certainly with some

17   anxiety components, and chronic insomnia.  And I discovered

18   attention deficit disorder.  That wasn't immediate, but after

19   we talked for a while, it started to appear obvious.

20   Q.   How'd you diagnose the ADD?  Is there a mechanism or

21   through a --

22   A.   No.  It was by observation and listening to his history.

23   The signs of attention deficit disorder in adults, or children

24   either, there are no fast rules for it, and most all tests are

25   not very -- not very firm.  So just a plethora of issues that

Larson - Direct

10

1   he told me about that related -- that I deduced were -- could

2   be related to lack of focusing, lack of ability to focus,

3   presentation, how he presented to me, and his history.  And it

4   would be longstanding -- actually a lifetime problem.

5   Q.   Did you prescribe him medication for the ADD?

6   A.   Yes, I did.

7   Q.   What was that medication?

8   A.   It was called Vikas, and it's a kind of Adderall, form of

9   Adderall.  And he reported to me, after first prescribing it,

10  quite a bit of difference in his ability to organize his

11  thoughts, stay focused, not be distracted.

12  Q.   Was that helping with his -- was getting the ADD under

13  control, at least in your opinion, helpful in him dealing with

14  the other issues; the chronic insomnia, the alcohol, the

15  depression, all those issues?

16  A.   I think the alcohol's -- my impression, it has helped a

17  great deal there.  He told me about things that he was trying

18  to do with his wife and would seem not successful, but he was

19  making a concerted effort, which seemed to me -- I didn't know

20  him before June, but seemed to me, and he thought, it was a

21  different way of approaching her.  So he was just more

22  organized in his thinking and more likely to complete tasks

23  that he started.

24         He was quite a fine communicator.  You have to be

25  able to get his point across and tell his -- tell a sequence

*Larson - Direct*

11

1   of events for a story that's quite cohesive and coherent.

2   He's built that way.

3   Q.   So he responded to the medication, in your opinion?

4   A.   He responded quite well.

5   Q.   Would you -- do you think he'd benefit from continued --

6   would you have released him from treatment, had he not been

7   incarcerated?

8   A.   Oh, no, no.  He was -- he was a great -- excellent

9   candidate for therapy and for change.  He just seemed to me to

10  be open to communicate his thoughts and feelings that were --

11  that were relevant for my purposes in being able to help him

12  and now being able to -- you know, when he started the

13  medication, being able to focus and actually get some -- you

14  know, get somewhere in his life.

15          And then as it -- from my understanding of his

16  history -- well, actually, a typical scenario for adult ADD,

17  finishing things being a problem.  The alcoholism is --

18  sometimes can be a factor in ADD because of tension and

19  depression, anxiety, that comes from ADD.  But he started

20  drinking, I think, fairly young; and so that was -- you know,

21  it's not a problem caused by the ADD, but he used it to cope

22  with the fatigue and the tension and anxiety caused by ADD.

23  Probably ADHD.  Probably the hyper -- probably ADHD.  That's

24  just the hyperactivity component.

25  Q.   So you would recommend that he would continue with his

*Larson - Direct*

12

1  psychological counseling under any situation, whether he's

2  incarcerated or whether he was not?

3  A.   Absolutely.   I was looking forward to working with him as

4  a patient because he was responsive to my interventions and he

5  seemed quite motivated.

6  Q.   Regarding the medication, now, you have not actually

7  treated him for some months now, correct?

8  A.   That's correct.

9  Q.   You said you thought the medication was useful and he

10 responded well to it back then?

11 A.   Yes.

12 Q.   I think we had a discussion, I think I had told you that

13 they had taken him off medication in the jail?

14 A.   Yes.  Yes.

15 Q.   Do you have an opinion on whether or not he should be on

16 that medication?

17 A.   Well --

18 Q.   Based on at least your prior contacts with him?

19 A.   Yeah, he can survive all right, but life is harder, quite

20 a bit harder, without it.   And his life of being --

21 accomplishing as much as he can, is able to -- is a lot less.

22 I think he's been -- has the potential to be a good writer;

23 and to polish that, it would be very, very helpful to be

24 medicated and focused.

25 Q.   Do you have any opinion on the -- his likelihood for

*Larson - Direct*

13

1    success?  And by that, I mean avoiding the kind of problem

2    that got him into this situation, if he remains untreated and

3    unmedicated.

4    A.   Oh, yeah.  Could you be more clear and say that again?

5    Q.   Yeah.  It wasn't a very good question.  Were he to remain

6    unmedicated and go without any further psychological

7    treatment --

8    A.   Yes.

9    Q.   -- do you have an opinion on whether or not he would be

10   able to move past the issues that got him before the Court, or

11   would he -- or would not be able to?

12   A.   I think he -- I think he could with or without.  I think

13   he would.  The -- the combination of stresses on his body and

14   on his mind were such that I believe the special conditions

15   led to his activities.  Any one of them, the alcohol by

16   itself, the ADD by itself, the problem with his wife by

17   itself, the estrangement from his daughter, insomnia, and

18   depression individually would not cause his behavior.  But put

19   them all together, you know, I think those problems are very

20   related to his behavior.

21        But without -- without treatment, without ADD, I

22   don't think it would -- he would repeat any of those things.

23   But put them back together again, which is not likely to

24   happen at all -- you know, it could happen, but I think the

25   chances of that is pretty zero.  Or never say never, but

Larson - Direct

14

1   pretty remote.

2   Q.   Is there anything else that you can add, anything I

3   forgot to ask you about, or anything that you think is salient

4   about Mr. Mullikin's case?

5   A.   Well, I just want to say what an excellent therapeutic

6   candidate he is and his availability to change.  And I might

7   say a little bit about his -- the psychological aspect; that

8   he, I think, recognized when he was young, he had talent and

9   ability to be -- to convince people of something he was trying

10  to, a point, and he had a gift of gab early.  But his family

11  scenario was such that he would -- he could get people to

12  respond to him, but I'm not sure he understood why they were

13  responding to him, not his -- you know, not necessarily their

14  wishing to please him, because his self-esteem wasn't great

15  through the years.

16      But that is what -- if we had been able to work

17  together, that's one issue I would have really focused on, who

18  he really is and how people relate to who he really is.

19      He knows he has skills, but not -- but not fully

20  embraced that this is his -- his goal or his wish or his

21  mission to -- his motive to help people, influence people, in

22  the political arena, but it just seemed to happen for him.  He

23  would say some good things, and they would just -- they would

24  respond to him, but he's not sure about the connection.

25  That's what I would have worked on.

*Larson - Cross*

1    Q.   Okay.

2    A.   And that would have made him feel more effective and

3    would have -- could have, I think, greatly improved his life.

4          MR. ALERDING:  I don't have anything further, Your

5    Honor.  Thank you, Doctor.

6          THE WITNESS:  Thank you.

7          THE COURT:  Mr. Denney.

8                    CROSS-EXAMINATION

9    BY MR. DENNEY:

10   Q.   Good morning, sir.  Just a couple questions.  When did

11   you say that you first encountered Mr. Mullikin?

12   A.   It was June 12th, 2009.

13   Q.   Of 2009?

14   A.   Yes.

15   Q.   So that was well after the search warrant had been

16   executed on his home and his computers were confiscated?

17   A.   No.  You know, I saw him before then so this might -- my

18   data may be incorrect.

19   Q.   Could it have been June, 2008?

20   A.   2008, yes.

21   Q.   Okay.  So that would have been before the search warrant

22   was executed?

23   A.   Right.  Yes.

24   Q.   Okay.  Did Mr. Mullikin ever make any statements to you

25   regarding child pornography?

*Larson - Cross*

16

1   A.   No, he didn't.

2   Q.   Did Mr. Mullikin ever make any statements to you

3   regarding any sexual dysfunction in his life?

4   A.   Just between he and his wife.  They weren't compatible.

5   Q.   Okay.  And lastly, Doctor, are you aware that the Federal

6   Bureau of Prisons has mental health programs and professionals

7   available to treatment him next?

8   A.   Available.  I don't know the details.

9            MR. DENNEY:  Okay.

10           THE COURT:  All right.  Thank you.  Anything else?

11           MR. ALERDING:  No.  I just apologize about giving

12   that date wrong, but nothing, sir.

13           THE COURT:  All right.  I think he corrected that,

14   June of '08.  All right.  Thank you.  You may step down.

15   Thank you.

16                   (The witness was excused.)

17           THE COURT:  Thank you, Mr. Alerding.  You may call

18   your next witness.

19           MR. ALERDING:  Judge, I'll call Dr. Ed Connor.

20           THE COURT:  Thank you.

21           MR. ALERDING:  He's out in the hall.

22       DEFENSE WITNESS, EDWARD CONNOR, Psy.D., SWORN

23           THE COURT:  Thank you.  Mr. Alerding, you may

24   proceed.

25           MR. ALERDING:  Thank you, Your Honor.

*Connor - Direct*

17

|     |                                                          |
|-----|----------------------------------------------------------|
| 1   | DIRECT EXAMINATION                                        |
| 2   | BY MR. ALERDING:                                         |
| 3   | Q.   Dr. Connor, could you state your name?             |
| 4   | A.   My name is Edward Connor.                          |
| 5   | Q.   And how are you employed?                          |
| 6   | A.   I'm a licensed clinical psychologist in private practice |
| 7   | in the State of Kentucky and Indiana.                  |
| 8   | Q.   I contacted you about a sex offender risk assessment in |
| 9   | this case, correct?                                     |
| 10  | A.   Correct.                                           |
| 11  | Q.   Just briefly explain what your qualifications are for |
| 12  | performing these risk assessments.                     |
| 13  | A.   I'm licensed by the State of Kentucky to conduct sex |
| 14  | offender risk assessments.  I've been trained in sex offender |
| 15  | risk assessments and the treatment of sex offenders since |
| 16  | approximately 1993.  I conduct risk assessments for the state, |
| 17  | as well as the federal government, and the Catholic church. |
| 18  | Q.   And the Catholic church?                           |
| 19  | A.   Correct.                                           |
| 20  | Q.   Okay.  I couldn't understand what you said the first |
| 21  | time.  When you say you do them for the federal government, in |
| 22  | the context we're talking about here?                  |
| 23  | A.   Yes.                                               |
| 24  | Q.   Do you also do them for the BOP?                   |
| 25  | A.   In the context when someone comes out on probation or |

Connor - Direct

18

1    parol, the Probation Office might want me to conduct a risk

2    assessment before they're admitted into the treatment program.

3    Q.   Okay.  So you do them on behalf of defendants sometime at

4    the behest of counsel, also sometimes --

5    A.   Correct.

6    Q.   -- at the behest of the Probation Department?

7    A.   Yes.

8    Q.   Okay.  And in the course of your practice, you did meet

9    with Ken Mullikin?

10   A.   I did.

11   Q.   What's the -- what's the process that you go through to

12   do the assessment?

13   A.   First of all, I conducted a clinical interview, which

14   assesses for any kind of childhood development issues; a

15   mental status exam to determine if -- their state of mind at

16   the time of the interview, make sure that they're not typing

17   from some type of psychosis or other psychiatric disorder.

18        I'll also conduct a sexual development interview, which

19   is very essential to understanding what experiences they may

20   have had throughout their childhood with regard to sexual

21   experiences, initial sexual experiences, sexual preferences

22   and practices, as they go through adolescence and adulthood.

23        I'll also conduct, depending on -- on what concerns I may

24   have, different tests to determine if they can pay attention

25   or if they are impulsive.  In this case, I felt that there was

*Connor - Direct*

19

1    some level of impulsivity and deficits in attention; and,

2    therefore, he was administered what's called the Test of

3    Variables and Analysis of Attention to determine these

4    deficits.

5          An I.Q. test is important as well to discern if they are

6    of average intelligence or above average, below average.

7          I also conduct what's called the Millon Clinical

8    Multiaxial Inventory, which assesses for any kind of

9    personality disorders or personality traits.  We know that

10   certain personalities tend to be more deviant or more engaged

11   in antisocial behavior.

12         The Hare Psychopathy Checklist, the short version.  We

13   know from the research that psychopathy is a predictor of

14   people who act out in deviant sexual ways, either with

15   children or otherwise.  It assesses for the behavioral

16   components, the emotional components, as well as the

17   interpersonal components of a person.

18         The Sexual Violence Risk is a guideline that we use to

19   help us determine if a person is at higher or moderate or

20   lower risk to commit some type of a sex offense.

21         The Abel Screening Assessment is a computerized

22   assessment where we measure visual response time to 21

23   different age categories of both genders, ranging from the

24   toddler pretty much to the adult.  And they're shown 160

25   different images twice where we're measuring their visual

*Connor - Direct*

20

1    response time to these different images.

2        If I can have access to information such as the

3    presentence investigation, which I did in this case, I will

4    review that as well.

5    Q.   Just to touch on one thing real quick, Mr. Mullikin told

6    you about his visits with Dr. Larson?

7    A.   He did.

8    Q.   And his -- Dr. Larson's treating him for ADHD?

9    A.   Correct.

10   Q.   Do you have any reason to dis -- any different opinion

11   about whether or not an ADHD or an ADD diagnosis was

12   appropriate in the case?

13   A.   I believe it was appropriate in the case.

14   Q.   I guess going through the things you did, when you --

15   what did your mental status exam tell you?

16   A.   Well, the mental status exam was pretty much what I had

17   expected.  There was no indication of psychosis.  There was no

18   indication of a bipolar disorder or manic depression.  There

19   was no indication of any type of schizophrenia.  There was

20   certainly depression there, which I believe had been there for

21   quite some time, but there was no indication of any severe

22   psychiatric symptomatology that I was concerned about.

23   Q.   Is there anything remarkable about the sexual development

24   exam -- I guess exam or however you term it?

25   A.   Well, this -- this is where it became somewhat

Connor - Direct

21

1    complicated, in my opinion.  He reported being spanked by a

2    nun that he felt to be fairly attractive when he was in the

3    fifth grade with a ruler on the buttocks; and, as a result,

4    became sexually aroused, and was confused by this experience.

5         In my clinical experience, I have seen this before, where

6    someone was spanked on the buttocks and, for whatever reason,

7    the genitalia was stimulated at the same time, and they

8    developed an interest in spankings or sadomasochistic type of

9    sexual deviancies, which we know, simply based on research,

10   that there is a huge, huge amount of people who are interested

11   in sadomasochistic-type behaviors or spankings in terms of

12   sexual arousal.  So this seemed to be the etiology of this

13   interest in spankings, in sexual arousal.

14   Q.   And I gather from what you just said, then, that his

15   experience is not a unique or particularly unusual experience?

16   I mean, at least as far as having -- you said you've seen

17   things like this before?

18   A.   Yes.  In my work as a clinical psychologist who works

19   with these types of behaviors, I have certainly seen these

20   issues before.  In the general population, I don't believe

21   it's very normal, but it is certainly present.  And my

22   practice, again, is very focused on this type of clinical

23   problem.  I certainly have worked with this before.

24   Q.   I guess I should have rephrased my question.  I wasn't

25   talking about the global population --

Connor - Direct

22

1   A.   Uh-huh.

2   Q.   -- just in your experience.

3   A.   Uh-huh.  Yes, that's correct.

4   Q.   No, it was my bad question.  Sorry.  What did you find

5   out about his mental status, or what was your opinion of his

6   mental status?

7   A.   Well, I think again, I felt that his mental status was

8   pretty much within the normal range.  There was certainly

9   attention deficit issues there.  There was some depression

10  there that, again, I believe had been present since his

11  adolescent years.  There was a history of alcoholism that I

12  think exacerbated the depression over time as well.

13  Q.   Other than the issue of -- issue involving the nun, was

14  his sexual development remarkable otherwise, or was it fairly

15  normal?

16  A.   Other than that, it was fairly normal.  He began to be

17  involved in pornography, which led him down that path of

18  deviant types of pornography.  But other than that, I felt it

19  was fairly normal.

20       There was -- as far as I could tell, there was no

21  indication of a obsessive-compulsive masturbation,

22  obsessive-compulsive types of sexual behaviors with other

23  people.  I have no way of verifying this, but he denied any

24  type of use of prostitutes for sadomasochistic or

25  spanking-type sexual arousal experiences.

Connor - Direct

23

1   Q.   Did he report to you any -- any unusual sexual

2   relationships, sexual experiences, experiences with people

3   significantly younger than him, anything like that?

4   A.   No.  He -- I think the youngest person he had actually

5   had sexual contact with was, I believe was his wife, who was

6   somewhat younger than him.  He was never molested as a child,

7   things like this that we look for.  Other than the interest in

8   spankings for sexual arousal purposes, there did not seem to

9   be anything very remarkable.

10       And also, I might add that we look for paraphilias.  By

11  this, I mean any other deviant sexual behaviors, because we

12  know when people cross sexual boundaries into other

13  deviancies, they're more likely to act out these various

14  deviancies.  And not only did he deny interest in other

15  paraphilias, sexual paraphilias, but the Abel Screening

16  Assessment that I administered to him did not pick up on any

17  other type of sexual deviancy or paraphilias.

18  Q.   In the course of doing that Abel Screening, are there

19  ways to -- for you to discern whether someone is leading you

20  down a primrose path, so to speak, or whether they're being

21  upfront with you?

22  A.   Not so much on the questionnaire aspect.  And that is

23  certainly a limitation of the test.  Now, with the visual

24  response time, there is more ability to discern if someone is

25  trying to be deceitful or simply not responding to the -- to

Connor - Direct

24

1    the images as we would anticipate.

2    Q.   And did you find any indication that he was being

3    deceitful, at least about the paraphilias?

4    A.   No, I did not.  And I -- but what also is considered is

5    his responses to the other tests.  The other tests, such as

6    the Millon Clinical Multiaxial Inventory, has reliability and

7    validity skills that we look at to see if they're trying to

8    respond in a socially desirable manner.  That did not seem to

9    be the case.

10        And even the Abel questionnaire has a social desirability

11   skill.  In other words, are they just responding based on what

12   they think is the right answer versus how they may truly think

13   or feel. He seemed to be forthright, as far as I could tell.

14   Q.   He reported to you his drug and alcohol history, or

15   history of abusing alcohol?

16   A.   Yes, he did.

17   Q.   Okay.  Based on all the various things you did with him,

18   were you able to form a -- well, number one, a diagnosis?  I

19   guess for lack of a better word, just call it a DSM diagnosis?

20   A.   Yes.

21   Q.   And I guess if you could tell us, for the record, what

22   the DSM is.

23   A.   The Diagnostic and Statistical Manual.  It is in the

24   third edition right now and -- I'm sorry, the fourth

25   edition -- and it is the manual that we use for diagnosis.

*Connor - Direct*

25

1   Q.   And what diagnosis did you reach, as best --

2   A.   I believe him to have what's called dysthymia.  Dysthymia

3   is a chronic grade of maldepression, which I believe began in

4   his adolescent years.  He began to abuse alcohol around the

5   age of 14.  And I believe that this, in part, was due to

6   his -- his mild grade of chronic depression.

7        Certainly the attention deficit hyperactivity disorder

8   seems to be a very relevant diagnosis.  Alcohol dependence, I

9   think there were periods in his life where he was more

10  dependent on alcohol than at other periods in his life.  It's

11  certainly in remission due to being incarcerated.

12       Nicotine dependence.  He was a very heavy smoker.

13       And then as far as the -- there did appear to be some

14  medical problems as well, circulatory problems, and a

15  self-reported history of an aneurysm.

16  Q.   Okay.  Did you also reach a conclusion or make an

17  assessment of what you considered to be his risk as a sex

18  offender?

19  A.   I did.

20  Q.   And what was that assessment?

21  A.   Well, it's not as black and white, perhaps, as we would

22  prefer, partly -- and due to with the offenders that we are

23  assessing who have been involved in child pornography, it's

24  somewhat difficult to make an exact assessment on risk level

25  if there have not been any previous violations of a child.

Connor - Direct

1    If he is treated properly, in terms of the type of sex

2    offender treatment that we use for people who have been

3    involved in child pornography --

4    Q.  Actually, let me interrupt you there.  Do you also, do

5    you treat sex offenders that are on supervised release --

6    A.  Yes, I do.

7    Q.  -- with the federal government?

8    A.  Yes, I do.

9    Q.  Okay.  And that's also at the behest of their parole --

10   their probation officer or whatever?

11   A.  That's correct.

12   Q.  Okay.  So because you're in this community, he might very

13   well be referred to you when he got out on supervised release

14   someday; is that --

15   A.  That's correct.

16   Q.  Okay.  Anyway, I just wanted to make sure of that.

17   A.  Yes.  I think in the immediate future, he would be at

18   very low risk to reaccess child pornography.  He seemed to

19   have a very genuine degree of shame and embarrassment and

20   humiliation for what he's done.  This will, in my experience,

21   oftentimes hold any desire for deviant pornographic imagery at

22   bay for quite some time.

23       Now, if he's left untreated, then I believe his risk

24   level to access child pornography in the future would be

25   moderate.  I think that this would resurface if he did not

*Connor - Direct*

1   receive the proper treatment for this urge.

2       In terms of offending a child, though, I have no

3   information to verify that he has actually ever offended a

4   child; and, therefore, I believe that his risk is -- is low to

5   do that in any way.

6       And I have to add, though, what's concerning is that he

7   did masturbate to child pornographic images, and so this would

8   cause a concern in terms of his -- his risk issue, which, as I

9   state in the report here, that if given proper

10  circumstances -- and by that, I mean if he were left

11  untreated, if he were viewing child pornography, and he was

12  consuming alcohol again, in a certain circumstance, he may be

13  at low to moderate risk to actually offend a child.  But that

14  would have to -- all the variables would have to be in place.

15  Also a void of any kind of treatment for that to occur.

16  Q.   And he would have to have access to a child?

17  A.   Absolutely, yes.

18  Q.   Based on your work with sex -- sex offenders in the past,

19  do you have any opinion on how he will -- how he would respond

20  to treatment in the future, assuming he -- assuming he did

21  what he was supposed to do and came into treatment?

22  A.   My initial impression is that his prognosis for treatment

23  would be very good.  He has an I.Q. of approximately 125.

24  He's a very intelligent man.  At this time, he's very

25  remorseful and embarrassed about all of this.  And I think he

Connor - Direct

28

1    would respond very well to treatment.

2        I don't see any history of severe psychopathology or

3    antisocial-type behavior, any kind of criminal pattern of

4    behavior, which increases the prognosis for a positive

5    treatment outcome.

6    Q.   Now, I noticed that when I received a letter from

7    Dr. Larson, and then also both of you mentioned a lack of

8    closed-head injuries --

9    A.   Yes.

10   Q.   -- as related to his possibility of being a pedophile.

11   Is there -- is there a relationship between -- well, he

12   doesn't have them.  He doesn't have any of those.  Did you

13   find any indication -- I'll strike that.

14       Is there anything else that you wanted to add about

15   Mr. Mullikin, anything that I should have brought out that

16   maybe I simply forgot?

17   A.   No.   I -- I believe that the essential elements were

18   covered.

19       MR. ALERDING:  Okay.  Nothing further.  Thank you,

20   Doctor.

21       THE WITNESS:  Thank you.

22       THE COURT:  Thank you.  Mr. Denney, do you have any

23   questions of Dr. Connor?

24       MR. DENNEY:  Yes, Your Honor, just briefly.

25       THE COURT:  Yes, sir.

Connor - Cross

1                          CROSS-EXAMINATION

2    BY MR. DENNEY:

3    Q.   Good morning, Doctor.

4    A.   Good morning.

5    Q.   Sir, you mentioned all of the tests that you used to

6    evaluate the defendant.

7    A.   Yes.

8    Q.   Which of those tests is designed to measure dangerousness

9    of child pornography collectors?

10   A.   We don't have that type of methodology yet to actually

11   measure child pornography collectors.  We're -- we're relying

12   on what we have used thus far in the field.

13   Q.   So is it fair to say you're relying on your clinical

14   judgment?

15   A.   Not necessarily.  It is also -- it is my clinical

16   judgment, yes, sir; but it's also some of the factors of --

17   approximately two months ago, I was in Chicago for meetings on

18   this with Dr. Michael Seta, who I think is a leading

19   researcher in this field on child pornography and so forth.

20   And in our discussions, it still seems to be pretty reliable

21   to use these instruments to determine if the child pornography

22   collector is going to act out on a victim, or are they solely

23   focused and remain in the child pornographic arena.

24   Q.   You mentioned the name of one researcher.  Are you aware

25   of any other recent studies that examine the link between

Connor - Cross

30

1    child pornography collectors and hands on offenders?

2    A.   Dr. Abel in Atlanta is addressing this issue.  I know

3    there is others that I don't know right off the top of my

4    head.

5    Q.   I'm going to show you what has been marked for

6    identification as Government's Exhibit 1.  A copy has been

7    provided to defense counsel.  Can you please identify that for

8    us, Doctor?

9    A.   This is the Butner Study of -- they did a report of the

10   incidents of hands-on child victimization by child

11   pornographic pornography offenders.

12   Q.   Are you aware of this study?

13   A.   Very much so, yes.

14   Q.   Okay.  If you could turn -- I believe it should be the

15   second page.  I've highlighted several sections there.

16   A.   Yes.

17   Q.   Could you please read for the Court the first highlighted

18   section?

19   A.   "The mental health professionals are forced to rely on

20   their best clinical judgment when making decisions about risk

21   classification and management, diagnosis and treatment

22   methodology.  Unfortunately, this often includes extrapolating

23   from assessment and treatment techniques that were developed

24   and validated for the use of other types of offenders, such as

25   substance abusers."

*Connor - Cross*

31

1          MR. ALERDING:   Your Honor --

2   Q.   If we could turn back to the --

3          MR. ALERDING:   I'm sorry.   I just need the

4   highlighted section.   Where are we reading?

5          MR. DENNEY:   It would be the second page.

6          MR. ALERDING:   Okay.

7   BY MR. DENNEY:

8   Q.   If we can turn back to the facts of this case, when was

9   it that you first interviewed Mr. Mullikin?

10   A.   December the 28th, I believe was the first interview.

11   Q.   So just last month?

12   A.   Yes, sir.

13   Q.   Okay.   Just interviewed him the one time?

14   A.   Correct.

15   Q.   Okay.   During that interview, I believe your report

16   states that Mr. Mullikin reported to you that he never asked

17   for child pornographic images?

18   A.   Yes.

19   Q.   But chatted about spankings?

20   A.   Correct.

21   Q.   And some were sent to me; is that right?

22   A.   Yes.

23   Q.   Could you please explain that?   Please put that quote, I

24   guess, into context for us.

25   A.   Oh, in doing these assessments, one of the things I want

Connor - Cross

1   to know is if they were actively seeking and asking for child

2   pornography, if they were actually contacting people looking

3   for it.  And, as he explained it to me, he did not actively go

4   out and seek it.  People would send it to him; he would accept

5   it.

6        Now, I am -- I am not as familiar with LimeWire as

7   perhaps other people, but I understand that there was

8   apparently some sharing of this through LimeWire, but I don't

9   know the extent of that.

10  Q.   Can you please -- do you have any other -- please explain

11  a little bit more about what Mr. Mullikin says when he --

12  meant when he said, "People would send it to me."  Did he

13  explain to you how or why people would send it to him?

14  A.   He would be in chat rooms and talk about spankings.  And,

15  as I understand it, when chat of this nature goes on and

16  someone, a receiver of this type of chat, will then send

17  information or images, whatever, to that person or ask them if

18  they would like some.

19  Q.   Was it your impression that Mr. Mullikin believed himself

20  to be an innocent victim?

21  A.   No.  I believe that he knew what he was doing.

22  Q.   If we could -- if I could ask you to again turn to the

23  Butner study, Government Exhibit 1.

24  A.   Yes.

25  Q.   Can you please read the second highlighted portion from

*Connor - Cross*

33

1   that, please?

2   A.   "Formal therapy has, in some child pornography offenders,

3   attempt to persuade law enforcement officials, treatment

4   providers, and members of the judiciary that they have -- that

5   they discover child pornography sites inadvertently.  They

6   deny they ever sought deviant material and, instead, claim

7   that strangers e-mailed them child abuse images unsolicited.

8   Despite their claims of unintentional involvement, these

9   offenders are unable to convincingly articulate a reason why

10  someone would distribute illegal material to unknown persons,

11  an act we equate to someone mailing bags of cocaine to random

12  addresses."

13  Q.   If we could, let's turn back to the results of your own

14  examination of the defendant.

15  A.   Okay.

16  Q.   Is it true that you found him to be highly intelligent?

17  A.   Yes.

18  Q.   I believe you also talked about, with Mr. Alerding, the

19  defendant's lack of any sexual deviances.  Is that fair to

20  say?

21  A.   Yeah.  Any of the other deviancies, yes.

22  Q.   Okay.  Now, you also found that while the defendant

23  himself admitted to you that he had sexual attraction to girls

24  that were 13 years of age and younger?

25  A.   Correct.

Connor - Cross

34

1    Q.    Is attraction to children, would that not be considered a
2    sexual deviance?
3    A.    Well, the attraction to the prepu -- to answer your
4    question, yes.  And the way this came out was in the Abel
5    Screening where there was an elevation on that particular
6    scale of the prepubescent female.  So I believe that there is
7    a degree of denial in this attraction that needs to be
8    addressed in his psychotherapy, which, in my experience, is
9    not uncommon.  That's typically how they get to my office.
10   Q.    Okay.  Would you please read the third highlighted
11   portion of the Butner study?
12   A.    "Still others assert that their behavior is attributable
13   to an underlying mood or anxiety disorder, bipolar disorder,
14   obsessive-compulsive disorder, a misguided attempt to work
15   through their own childhood victimization or on-line
16   investigative vigilanteism."
17   Q.    Okay.  Doctor, did you ever review the actual images
18   possessed by the defendant?
19   A.    I did not.
20   Q.    Did you review the transcripts of the chats he engaged in
21   with the undercover officer?
22   A.    No, I did not.
23   Q.    Wouldn't you agree, though, that the content of graphic
24   sexual chats in a situation where the communicator doesn't
25   think anybody's watching might be a good measure of that

*Connor - Cross*

35

1    person's sexual interest?

2    A.   I -- I think so, yes.  If I had not had my own

3    measurements where there was an interest, in his own

4    admission, to his sexual interest in the spanking of children,

5    I would have further wanted to review that video, but he had

6    acknowledged that.

7    Q.   Okay.  Are you aware that many of the more than 8,000

8    images possessed by the defendant did not depict spanking?

9    A.   No, I'm not aware of that.

10   Q.   Lastly, Doctor, you've talked about the recommended

11   treatment program.  Are you aware that the Federal Bureau of

12   Prisons has mental health programs and professionals to treat

13   inmates?

14   A.   Yes.  I worked at Butner, FCI Butner, for a year.

15   Q.   And if you could, just read the last highlighted portion

16   on the Butner statement that we marked as 4.

17   A.   Number 4?

18   Q.   Yes.

19   A.   "We believe that few, in any, of the offenders in our

20   sample would have admitted the true extent of their sexual

21   offense histories if they had not participated in an intensive

22   treatment program.  The findings of this study underscore the

23   importance of prison-based sex offender treatment by enhancing

24   the accuracy of risk appraisals, which ultimately improve the

25   management of offenders in the community.  The dramatic

*Connor - Cross*

1    increase 2,369 percent and the number of contact sexual

2    offenses acknowledged by the treatment participants challenges

3    the often-repeated assertion that child pornography offenders

4    are only involved with pictures.  It appears that these

5    offenders are far more being innocent" -- oh, I'm sorry, "far

6    from being innocent sexually curious men who, through

7    deviant -- or who deviate or, dumb luck, became entangled in

8    the World Wide Web."

9    Q.    Okay.  And if I could just ask you a couple housekeeping

10   questions, Doctor.  If you could please identify the authors

11   of Exhibit 1?

12   A.    Michael Bourke and Andres Hernandez.

13   Q.    And are you aware of their occupations?

14   A.    Yes.  They are with the -- I believe they're still at FCI

15   Butner.

16   Q.    Okay.  And they are mental health professionals?

17   A.    My understanding is that they're both psychologists,

18   correct.  Yes.

19   Q.    Okay.  And if you could, just identify for us the

20   citation to the article we've been reading from.

21   A.    Do you mean this title of the article or the journal?

22   Q.    The citation in the upper left corner there.

23   A.    It was published in the Journal of Family Violence, 2009,

24   Volume 24, pages 183 to 191.

25   Q.    Thank you, sir.

*Connor - Redirect*

37

A.    Thank you.

        MR. DENNEY:  And the United States moves to admit Government Exhibit 1 into evidence.

        MR. ALERDING:  No objection.

        THE COURT:  Exhibit 1 will be admitted at this time. And I will state to the attorneys, I am familiar with that study.  I have read it previously.

        (Government Exhibit No. 1 admitted into evidence.)

        THE COURT:  You may redirect.

        MR. ALERDING:  Just briefly, sir.  Thank you.

                    REDIRECT EXAMINATION

BY MR. ALERDING:

Q.    Doctor, Mr. Mullikin never intimated to you that he was an innocent victim caught up in the World Wide Web, did he?

A.    No, he did not.

Q.    Did he acknowledge -- whether or not he sought images, he acknowledged seeking like-minded people to discuss --

A.    Yes.

Q.    -- spanking of children on the Internet, correct?

A.    Yes, he did.

Q.    And when people sent him images, he did not deny receiving them and keeping them on his computer?

A.    That's correct.

Q.    And didn't deny looking at them and using them or doing whatever he did with them?

Connor - Redirect

1    A.    That's correct.

2    Q.    So is it fair to characterize him, as he is in the

3    report, people just innocently caught up who don't know how

4    they got into this jam?

5    A.    That is not -- that is not an accurate reflection of

6    Mr. Mullikin.

7    Q.    You say you're very familiar with the Butner study?

8    A.    I am.

9    Q.    In your opinion, is it good science?

10   A.    Well, I can't answer that in a yes or no question.

11   Q.    Okay.

12   A.    If I could expand.  Because when it was first studied, it

13   was pulled back -- and I think rightly so -- by the Bureau of

14   Prisons because of some faulty methodology in the study.

15       When the study was redone by Dr. Bourke and Hernandez, I

16   think they did a very good job of restructuring some of the

17   scientific methodology and the analyses of their data.

18       We have discussed this article -- when I say we, my

19   colleagues and I who are in this field -- and it's important

20   for us to pay attention to it.  It brings out some very

21   important points that we all need to be aware of.  By the same

22   token, we have to consider the population in which the study

23   was done on, which is an inmate population, and they don't

24   always tend to be as honest or forthright as perhaps they need

25   to be.

*Connor - Redirect*

1      Now, this was controlled by Dr. Bourke and Hernandez via

2  a polygraph as well, which showed some interesting results.

3  So it's an important study.  I think it is good.  I think it's

4  a good study, it's an important study, and it's also

5  controversial.

6            MR. ALERDING:  Fair enough.  Nothing further.

7            THE COURT:  Mr. Denney?

8            MR. DENNEY:  Nothing further, Your Honor.

9            THE COURT:  All right.  Thank you.  Dr. Connor, thank

10  you very much.

11                 (The witness was excused.)

12            THE COURT:  Mr. Alerding, will you have any

13  additional testimony to present?

14            MR. ALERDING:  No, sir.

15            THE COURT:  Thank you.  Mr. Denney, do you have any

16  testimony or evidence to present, other than the exhibit which

17  you've marked and has been admitted?

18            MR. DENNEY:  No.

19            THE COURT:  All right.  Thank you.  We do have the

20  one issue that I did want to discuss.  I'm a little unsure of

21  the parties' position.  It's the first enumerated objection

22  that I referenced earlier, and that is the defendant's

23  position on his use of the file-sharing program, LimeWire.

24            Mr. Denney, what would be the the proof of the United

25  States on this issue if this matter had proceeded to trial?

1     MR. DENNEY:  Well, Your Honor --

2     THE COURT:  I'm referring at least to the interview

3  that was conducted with the special agent for the FBI.

4     MR. DENNEY:  Well, first I would point out, this is

5  primarily not a LimeWire case.

6     THE COURT:  That's what I thought coming into this

7  hearing, but I'm not so sure at this point.

8     MR. DENNEY:  Yes, Your Honor.  It's primarily not a

9  LimeWire case.  It's our understanding and belief that most of

10  the contraband involved here was received via this murk, which

11  is Internet relay chat.  And it is the chatting that's been

12  referred to, both in testimony here and in a plea agreement,

13  that's the genesis of the offense.

14     The LimeWire issue, I believe the defendant

15  acknowledged that he used LimeWire to distribute music, but

16  there is no indication of a statement admitting contraband

17  sharing over LimeWire.

18     THE COURT:  Do we have an issue with respect to

19  acceptance of responsibility at this point in the case?

20     MR. DENNEY:  I would -- I would hesitate to say

21  there's no issue at all, Judge.  At the same time, pursuant to

22  the plea agreement, the United States is not going to contest

23  acceptance of responsibility at this time and would move for

24  the third-level reduction.

25     THE COURT:  All right.  Then at that point, I want to

1    get to the guideline calculations, and we'll go there at this

2    point.  Based on the representations of Counsel, the issue

3    that's raised in objection number 5 would not affect the

4    guideline calculation.  Therefore, it would not require a

5    ruling by the Court.  The Court does understand the parties'

6    position with respect to that issue.

7         Likewise, the two remaining objections really go to

8    ultimate conclusions of the Court -- well, at least the latter

9    does, that the objection number 14 was raised by prior counsel

10   as to whether a departure would be appropriate under perhaps

11   even 5H1.3, based upon the testimony of the two individuals

12   that have -- has been offered by the defendant, would not

13   support a departure for those reasons based on any

14   psychological condition under the guidelines.  So the Court

15   would overrule that objection.

16        As to the third objection, which goes to the issue of

17   a potential variance, I do want to hear from the parties

18   before making a final determination as to that issue.  But, of

19   course, if the Court finds that a variance would not be in

20   order, then that objection would be overruled.  If the Court

21   believes that it should be ultimately, that a variance would

22   be appropriate, then the Court would sustain the objection.

23   So that would be the manner in which we'd proceed on that.

24        Let me turn to the guideline calculations.  With

25   respect to the guidelines, there's one modification I will

42

1      make in paragraph 14.  And that is the 2009 edition of the

2      guidelines has been used in the case.  Does not affect the

3      guideline calculations, but the 2009 edition is used after

4      November 1st.  So, therefore, that correction would be made.

5      This matter was originally set for sentencing prior to

6      November 1st, at the time the presentence report was prepared.

7      The guidelines in effect at the time of sentencing, unless

8      they would be more beneficial to the defendant, would be

9      applied.

10             With respect to Count 1, count of conviction, the

11     base offense level on the case is a level 22.  There's a

12     two-level reduction under 2G2.2(b)(1) based on the conclusion

13     that the defendant did not intend to traffic in or distribute

14     the materials received and that were in his possession.

15             There's a two-level increase because the offense

16     involved prepubescent minors or minors that had not obtained

17     the age of 12.  There's a four-level increase because the

18     materials involved sadistic or masochistic conduct or

19     depictions of violence.  There's also a two-level increase

20     based on the use of a computer and a five-level increase based

21     upon number of images being in excess of 600.  That results in

22     an adjusted offense level of 33.

23             There is a three-level reduction shown for acceptance

24     of responsibility.  Before the Court can award the third level

25     for acceptance credited, it does require a motion from the

43

1    United States, and Mr. Denney just indicated that he was

2    moving for that third level.  The Court will sustain a motion

3    and apply a total of three levels for acceptance of

4    responsibility reduction.  The total offense level based upon

5    all those calculations is a level 30.

6         Mr. Mullikin does not have any criminal history

7    points, which would place him in Criminal History Category I,

8    in terms of determining the guideline range.  And that range

9    is set forth in paragraph 59.  And the range is a range of 97

10   to 121 months.  The fine range is set forth in paragraph 67,

11   and that is a range of 15,000 to 150,000 dollars.  Those are

12   the calculations that the Court has adopted.

13        I believe there are counts to be dismissed in the

14   case; is that correct?

15        MR. DENNEY:  Yes, Your Honor.  The United States

16   moves to dismiss Counts 1, 2, 3, 4, and 6.

17        THE COURT:  All right.  Let's see.  Count 7 is the

18   forfeiture count.  That will be reflected in the judgment.

19        MR. DENNEY:  That's correct, Your Honor.

20        THE COURT:  That motion will be sustained.  The Court

21   will dismiss the counts as to Mr. Mullikin.  Also, as I

22   indicated at the time the plea was entered, I have again

23   reviewed the plea agreement.  I've signed that document.  It

24   will be placed in the file at the conclusion of the hearing.

25        Are there any further motions to be taken up at this

44

1   time?

2        MR. DENNEY:  No, Your Honor.

3        THE COURT:  All right.  If not, we'll proceed with

4   allocution in the case.  I'll hear first from Mr. Alerding,

5   and also from Mr. Mullikin, if he would like to address the

6   Court.  Afterwards, I'll hear from Mr. Denney.

7        I will state, before parties make statements in

8   allocution, that I have reviewed the original sentencing

9   memorandum filed by the defendant, supplemental sentencing

10  memorandum that was recently filed, and the United States'

11  response to the last sentencing memorandum, as well as the

12  victim impact statements.  And Mr. Denney, if you would like,

13  either at this time, prior to allocution, or during

14  allocution, if there are victim statements that you wish to

15  read, you may do so, but I'll leave that to you.  Would you

16  prefer to do that at this time?

17        MR. DENNEY:  I think it's better to do that in the

18  context of 3553(a) argument.

19        THE COURT:  All right.  That will be fine.  All

20  right.  Mr. Alerding, we'll hear from you.

21        MR. ALERDING:  Thank you, Your Honor.  And Your

22  Honor, keeping in mind your familiarity with the record, I'll

23  be somewhat brief here.

24        Judge, I said in my sentencing memorandum, and I

25  guess I probably misstated, that he's an unlikely defendant.

1    I guess what I meant by that is, as the Government points

2    out -- well, as the Government points out, he is a likely

3    defendant in these kinds of cases.  Unfortunately, the kinds

4    of cases that will be before the Court of Appeals kind of

5    case, you often see more highly educated individuals with jobs

6    and stable family lives and things like that.  I guess what I

7    meant by an unlikely defendant is that in the context of the

8    panoply of criminal cases you see before you.

9         THE COURT:  In the great universe of cases that we

10   handle here.

11        MR. ALERDING:  Yes, exactly.

12        THE COURT:  I understand.

13        MR. ALERDING:  And actually, there was another issue

14   I wanted to address that Mr. Denney mentioned in his -- in his

15   response.  Well, obviously, it's in the context of this case.

16   Judge, I -- I'm not going to stand here and defend the actions

17   of Mr. Mullikin insofar as his possession of child

18   pornography.  There is -- you know, it is what it is.  He

19   admitted to his possession of it.  He admitted to how he came

20   into possession of it, his use of it.  I don't think there was

21   any question in his mind that he was tricked into having it or

22   it was forced upon him unwillingly.

23        I mean, he has accepted responsibility for doing what

24   he did, getting ahold of this information, however he got

25   ahold of it.  There was only one way to deal with it.  If

46

1    somebody sends you something you don't want, you call the

2    police, I would say.  Call the police and tell them somebody

3    sent me something I don't want; you ought to look into this.

4    But at very least, you get rid of it.  But he didn't do that,

5    and he acknowledges that.

6         What I want the Court to consider, though, is that --

7    not his guilt or his innocence or whether a punishment is

8    appropriate, but just what kind of punishment is appropriate.

9    As I have said in my memorandum, he is a -- he is a

10   58-year-old man.  He has been, as far as I know -- well, I'm

11   sure, he's had no criminal entanglements in the past.  There

12   is no indication -- I know the Government takes issue with

13   this, but there's no indication that he actively participated

14   in any sexual abuse.  And I guess, you know, I'm not going to

15   get into the semantics of whether downloading these images or

16   using these images is further abuse.  I mean as far as his

17   hands-on involvement with other children, there is no

18   indication that he has ever acted out sexually against anyone

19   in his life.

20        Mr. Mullikin -- likewise, I think the Government took

21   issue with this -- there's no indication that he was

22   transmitting these images.  I guess I said in my report,

23   there's no evidence that they were transmitted in any way.

24   Obviously, they were transmitted onto his computer, unless he

25   made them.  There's no indication he made these images.  So

47

1    there's no indication that he was actively -- an active

2    trader, a LimeWire trader.

3              THE COURT:  Right.  Well, I guess -- I guess where

4    the argument breaks down -- and several of these arguments do

5    break down for this reason:  He didn't do those things,

6    there's no evidence he did those things, but he wasn't charged

7    with that.

8              MR. ALERDING:  Right --

9              THE COURT:  And his guideline calculation is not

10   enhanced because of that.

11             MR. ALERDING:  Understood.

12             THE COURT:  So here's what we could do, is we could

13   say, okay, maybe he did and enhance the guidelines, and then

14   you say no, he didn't, and we take them back down.  We're at

15   the same -- at the same place as we started.  So --

16             MR. ALERDING:  By the same token, I could say, and he

17   hasn't killed anybody either.  I mean, there's a lot of things

18   he hasn't done.

19             THE COURT:  Exactly.  And he could --

20             MR. ALERDING:  He hasn't been punished -- that he's

21   not being punished for things he hasn't done.

22             THE COURT:  In many of these cases, we have the false

23   siligisim that's made, the argument that's made, that the

24   individual -- there's no evidence that the individual harmed

25   any child in the past, that he had any sexual contact with any

48

1    child in the past.  And, based on the evidence presented or

2    arguments made, there's not a likelihood that it would occur

3    in the future; and, therefore, he either shouldn't be punished

4    or his punishment should be less severe.

5           But it misses the point of what the true nature of

6    the crime is.  And that is, sexual exploitation of children by

7    dissemination of child pornography.  And the idea that

8    Congress -- and I agree with Congress on this point -- that if

9    you increase the penalties for this type of activity, you're

10   attacking the marketplace.  You're attempting to eliminate or

11   reduce those that would obtain that type of material and,

12   therefore, create less of an incentive to produce more of it.

13   It's a supply-and-demand argument.

14          So that's really the focus, I think, that Congress

15   intended with these laws, not to catch child molesters.

16          MR. ALERDING:  Sure.

17          THE COURT:  If that happens, that's a great benefit.

18   If one or two could get caught in the net, that's a great

19   benefit.  But it's not the intention of the statute itself.

20   And so a lot of times, people come in in these cases and they

21   make these arguments that the defendant is not a child

22   molester; therefore, he or she shouldn't be punished.  But the

23   person isn't being charged with that, and so we get

24   sidetracked on those issues and we really kind of ignore the

25   real issue, and that's the problem of sexual exploitation of

49

1    children through pornography.

2         MR. ALERDING:   And I don't want the Court to

3    misunderstand me that I am making that false siligisim that

4    just because -- because I'm not.   I understand the issue here

5    and what then we're talking about.   I guess the reason I bring

6    it up, obviously, I have a different opinion than you about

7    whether Congress was right or wrong to -- to ratchet these

8    guidelines up.

9         I think it's -- I don't think you can attribute

10   supply and demand and wise economic choices being made in the

11   arena of child pornography because it's also driven by an

12   underlying, a psychological issue.   It's not -- you know, it's

13   not widgets on the open market.   But nonetheless, I guess

14   really where I come down on this issue -- obviously, you come

15   down differently, but where I do come down on this issue is

16   that the mandatory minimum sentence, at the very least, 60

17   months, is a -- is certainly not a slap on the wrist,

18   certainly not for a man who has never been in trouble before,

19   never been in prison before.

20        You know, it's not -- I think a -- until they

21   change -- well, even after they change the law in the State of

22   Kentucky, this was a -- possession of a single image was a

23   misdemeanor punishable by 12 months.   Possession of multiple

24   images is now a B felony punishable by up to five years.   I

25   don't know that I agree with that.   That actually does sound

1    like a slap on the wrist.  I think five years sounds like a --

2    a very stiff punishment for any -- well, you know, not for

3    anybody.  I mean, you know, when I talk about the universe of

4    criminal defendants, I think I've got a lot of defendants who

5    would look at a five-year sentence as a gift.  I'm certain --

6    I think my father had a sentence with you where a woman got

7    life in the last month.  I'm sure she would look at a

8    five-year sentence as a gift in this kind of a case -- or in

9    her case.  So five years might not be a lot to some people.

10   Five years, I think, has a dramatic impact on a man like Ken

11   Mullikin.

12          I don't know that there is -- and I don't know

13   there's any evidence that there's any significant penological

14   benefit to 70 months or 80 months or 90 months as opposed to

15   60 months.  I think, you know, there is some indication in the

16   legislative history that the guidelines have been ratcheted

17   upward for arguably good reasons, arguably for political

18   reasons, because it's -- there is no lobby for purveyors or

19   possessors of child pornography.  It's a -- it's an easy

20   target.  It's easy to get up and stand on the floor of the

21   well of Congress and say, we're going to do something about

22   this, and it looks good and it sounds good.  I don't know that

23   it serves any penological purpose beyond -- that it serves

24   any.

25          I mean, this gentleman, if the Court would give him

1    the absolute minimum that you could, you're still looking --

2    he's still looking at a five-year sentence, and possibly a

3    lifetime on -- very likely a lifetime on supervised release

4    with the possibility of going back into jail for minor

5    violations, let alone doing what he did here.  And if he came

6    back into the system in possession again, I'm sure that he

7    would not be looking at a minimum sentence.  He's not looking

8    at a minimum sentence here.

9            Under all the circumstances, based on his lack of a

10   record, based on what I feel to be a flawed methodology in

11   Congress' decision to ratchet these upwards, we think that 60

12   months is certainly a -- we think 60 months sounds like an

13   appropriate sentence.

14           If the Court -- obviously, not if the Court, but

15   since the Court would disagree, we would ask the Court to

16   still consider him for some variance, even if it's a slight

17   variance.  I think -- I think right now, his guideline

18   calculation puts him at -- in a range of 97 to one hundred --

19           THE COURT:  97 to 121.

20           MR. ALERDING:  I just wanted to make sure I had the

21   top end correct.  You know, from our perspective, even a

22   slight variation into the 70-to-80-month range is still an

23   extraordinarily long sentence for a man who has not been in

24   trouble before.  And I think that that kind of sentence would

25   certainly be sufficient to drive home all the 3553 factors.

1          Certainly the purposes of sentencing, which is to --

2    you know, to -- I have more in my head right now.  I'm sure

3    the Court is aware of all the different factors.  You know,

4    the bottom line, Judge, is we think some slight variance is

5    appropriate in a case like this, but we leave it up to the

6    Court at this point.

7          THE COURT:  All right.  Thank you.  Of course, I'll

8    hear from Mr. Mullikin as well if he would like to add

9    anything.

10         THE DEFENDANT:  Your Honor, first, I'd like to

11   apologize, say I'm sorry to the victims of -- the children

12   that were being used to make the images that I viewed.  I used

13   the term "used" because certainly no child would choose to be

14   involved in the activity, and whatever circumstances, I

15   understand the legal approach of abusing a child.  I'd like to

16   apologize to all victims involved.

17         I'd like to apologize and, at the same time, thank my

18   family that is here today.  None of them condone anything that

19   I've done.  They certainly, some don't understand it.  But

20   they have been supportive of me, and I thank them.  My mother,

21   who couldn't be here today, is 80 years old, is still worrying

22   about the grandchildren and great grandchildren.  I put this

23   on her.  I apologize and say I'm sorry for that.

24         My friends that have stuck with me, I truly

25   appreciate it.  I'm very sorry for what I've done.  My former

1   wife, Jonna, her family, a family -- good family that I was

2   part of, I've now lost.  I apologize to them.

3          And last and most important to me, I apologize to my

4   daughter, Madeline.  She was 18 years old when this started,

5   coming home from a vacation after just graduating from high

6   school and what should have been the best summer of her life

7   before she went away to college; and, instead, I ruined it.

8   And I apologize for that hurt.

9          I understand your responsibility, Judge.  I've spent

10  a lot of time studying this -- this crime and the legislative

11  history behind it and the sentencing behind it and your

12  responsibilities to society and to the victims, and I want you

13  to know I don't take any part of those responsibilities, of

14  your responsibilities, I don't minimize or take any of them

15  lightly.  Naturally, I'm pointing out here things maybe that

16  just for my benefit, but I don't mean to say them to the

17  exclusion of the importance of other parts of the process.

18         I have lost my career and any chance of ever going

19  back to anything close to it.  I've lost, during the process

20  of this, any chance of trying to save my marriage.  Although

21  there was problems before, I could spend no time trying to

22  work on that.  I've lost contact with numerous good people

23  that I had worked with.  I'll never be able to function back

24  in the community that I -- I enjoyed working with so much ever

25  again.

54

1          I've learned a lot in the last 18 months, and 7 of

2     which has been in jail.  And I'm asking, from what I have

3     seen, that with whatever you have to do -- and I hope it is a

4     minimum -- but I hope you will put me in a position where I

5     can get -- can further and continue my -- or complete my

6     education in certain areas so that I can do something to help

7     prevent the -- prevent additional victims.  I've been housed

8     now for eight months with sexual offenders, and I've seen

9     some -- some strange things.  And I feel like there's some

10    things that I could be -- could be doing there, and I hope

11    that you will consider that.

12         I also ask that because of health problems been

13    talked about, that those can be taken into consideration

14    wherever I go.  And if I have to serve time in prison, I'd

15    like it to be as close to my family and my friends as I can

16    have it.  Their support's important to me.  And make it easier

17    on my mother, for everyone.

18         Yesterday was the 12th day of the month, and every

19    12th of the month is a bittersweet day to me because on the

20    12th of the month, that's one more month that I've been sober.

21    Yesterday was 18 months.  But it's also one more month that I

22    haven't spoken or hugged my daughter.  And I'm asking you to

23    please put me in a position where I can redeem myself and

24    prove my value to society and hopefully have my daughter

25    forgive me and have a relationship once again with her.  Thank

55

1    you.

2            THE COURT:  All right.  Thank you.  Mr. Denney?

3            MR. DENNEY:  Thank you, Your Honor.  Your Honor, the

4    United States would like to point out first that the

5    defendant's requested sentence of the statutory minimum is

6    wholly inappropriate in this case.  As Your Honor is aware,

7    that would be a variance of nearly half of what's called for

8    under the guideline range.  There has been no correspondingly

9    compelling justification to vary that far down from what the

10   guidelines take into consideration.  In fact, going that far

11   down to the very bare minimum would ignore the aggravating

12   factors taken into account by the guidelines.

13           With respect to aggravating factors, I think there

14   are some not necessarily adequately taken into account by the

15   guidelines, and first would be the image count.  As I pointed

16   out in our written submission, and it's what's clear from the

17   plea agreement, that is this defendant was responsible for 704

18   still images and 98 videos.  And under the relevant guideline

19   calculations, that works out to a total of over 8,000 images.

20   And as the Court well knows, the highest level the guidelines

21   recognize is 600.  I think a statutory minimum sentence would

22   completely ignore that aggravating factor.

23           Along with the other aggravating factor, this

24   defendant's active participation in the market here.  This was

25   not someone who sat silently behind a computer and things just

1    popped up in front of him.  This person, it's clear from all

2    of the things in the record, was actively chatting with

3    like-minded individuals and depraved networks regarding pretty

4    disturbing subjects.  This is somebody who actively

5    participated in the market, regardless of whether he sent any

6    images to anyone else.

7          I would also like to point out that, with respect to

8    the understanding of the testimony heard here today, the

9    United States' only objective in admitting that study into

10   evidence and cross-examining on the subjects was to

11   demonstrate that the issue is not so clear-cut.  There is at

12   least some scientific evidence out there that child

13   pornography image collectors may be more likely than an

14   average person to commit hands-on molestation of a child.  So

15   the United States' only point in cross-examining on that issue

16   and admitting that study into evidence is to demonstrate that

17   it's not clear-cut.

18         THE COURT:  That study also indicates that these are

19   all individuals that have been convicted of pornographic or

20   sexually related offenses and have been studied at Butner,

21   which is one of the primary areas in the country, in the

22   federal prison system, to connote treatment for those

23   individuals.  But that study also draws a link or correlation

24   between individuals that commit those offenses and have had

25   unreported incidents of contact with children.  In other

57

1    words, some of those individuals admit for the first time in

2    the course of that study that while they were never convicted

3    and never admitted, never admitted to doing this before, in

4    the course of the study, they do admit that they're -- that

5    they had contact with children.  And it's a pretty high

6    correlation.

7              MR. DENNEY:  Yes, Your Honor.

8              THE COURT:  That's not equitable necessarily here

9    because, again, we're talking about apples and oranges, but

10   that's one of the other things that the study -- one of the

11   other conclusions that the study draws.

12             MR. DENNEY:  Yes, Your Honor.  But I think it does go

13   back to another one of the 3553(a) factors, and that's the

14   need for treatment.  It's strictly in that custodial setting

15   that can help both this offender and that class of offenders

16   perhaps better than anything else.  But I only point that out,

17   Judge, just to demonstrate that the issue is not that

18   clear-cut.

19             But the ultimate point is that it doesn't matter.  As

20   the Court pointed out, that's not the crime here.  This

21   defendant's not being punished for molestation or his

22   predilection for molestation.  It has nothing to do with this

23   case.  Possession, collection, receipt of child pornography,

24   deserves a stiff punishment in and of itself.  It is the

25   most -- one of the most serious offenses that we see in

1     Federal Court.  I think nothing better describes the

2     seriousness of such an offense than the victim impact

3     statements the Court has already said that it has read and

4     considered.

5          One of the impact statements is from the victim --

6     the victim in the Vicky series.  She has requested that her

7     victim impact statement be read aloud during the sentencing of

8     every defendant who possessed any of her images.  And with the

9     Court's permission, I will do that now.

10          THE COURT:  Yes, sir.

11          MR. DENNEY:  To whom it may concern:  My name is

12    redacted.  I'm 19 years old and living every day with the

13    horrible knowledge that someone somewhere is watching the most

14    terrifying moments of my life and taking grotesque pleasure in

15    them.  I am a victim of the worst kind of exploitation, child

16    porn.

17          Unlike other forms of exploitation, this one is

18    never-ending.  Every day, people are trading and sharing

19    videos of me as a little girl being raped in the most sadistic

20    ways.  They don't know me, but they have seen every part of

21    me.  They are being entertained by my shame and pain.  I had

22    no idea the Vicky series, the child porn series taken of me,

23    had been circulated at all until I was 17.  My world came

24    crashing down that day, and now two years later, not much has

25    changed.

1        These past years have only shown me the enormity of

2    the circulation of these images and added to my grief and

3    pain.  This knowledge has given me a paranoia.  I wonder if

4    the people I know have seen these images.  I wonder if the men

5    I pass in the grocery store have seen them.  Because the most

6    intimate parts of me are being viewed by thousands of

7    strangers and traded around, I feel out of control.

8        They're trading my trauma around like treats at a

9    party, but it's far from innocent.  It feels like I am being

10   raped by each and every one of them.  What are they doing when

11   they watch those videos anyway?  They're gaining sexual

12   gratification from images of me at ages 10 and 11.  It sickens

13   me to the core and terrifies me.  Just thinking about it now,

14   I feel myself stiffen and I want to cry.  So many nights, I

15   have cried myself to sleep thinking of a stranger somewhere

16   staring at their computer with images of a naked me on the

17   screen.  I have nightmares about it.

18       My paranoia is not without just cause.  Some of these

19   perverts have tried to contact me.  One tried to find me

20   through my friends on MySpace.  Another created a slide show

21   of me on Utube.  I wish I could one day feel completely safe,

22   but as long as these images are out there, I never will.

23   Every time they are downloaded, I am exploited again, my

24   privacy is breached, my life feels less and less safe.

25       I will never be able to have control over who sees me

1  raped as a child.  It's all out there for the world to see,

2  and it can never be removed from the Internet.  I only ask

3  that those who have exploited me be brought to justice to

4  hopefully deter some others from doing the same and to lessen

5  my shame.

6          Thank you, Your Honor.

7          THE COURT:  Thank you, Counsel.

8          In determining a sentence in a case such as this,

9  there are a number of factors to be taken into account.

10 The -- the guidelines provide the starting point for this

11 Court, but the guidelines are not binding.  There are the

12 other factors that are to be taken into account in Title 18,

13 section 3553.  In evaluating those factors, I do want to

14 address some of the issues that have been raised, some of the

15 arguments that have been made, and some of the testimony that

16 has been presented here.

17         Let me first get to the issue of the testimony that's

18 presented by the two witnesses.  That testimony is helpful to

19 the Court, and it does support the Court's determination that

20 continuing treatment is appropriate, treatment not just within

21 the Bureau of Prisons system, but also in terms of supervised

22 release, imposing a life term of supervision for an individual

23 that's been engaged in this activity.

24         Whether the risk to the public is low or whether it's

25 moderate, the Court believes that the best way to address that

1    risk is through supervision and through treatment, and so the

2    life term of supervised release that's imposed typically in

3    this district for similar offenders is certainly appropriate

4    in this particular case based upon that testimony.

5         The testimony also highlights the fact that there are

6    a number of factors that can contribute to criminal activity,

7    whether it's excessive use of alcohol, whether it -- whether

8    it's all the other issues that have been raised.  While those

9    have happened in the past, there's no guarantee that those

10   stressors would not -- would not occur again in the future.

11   And, therefore, under the circumstances, it clearly supports

12   the determination of the Court that a life term of supervision

13   with restrictions is certainly appropriate.

14        There have been comments made about the guidelines,

15   are the guidelines too strict for these type of cases, or I

16   guess a contrary argument could be made are the guidelines not

17   strict enough.  The average punishment, average term of

18   incarceration for this type of offense, has been increasing.

19   As counsel correctly notes, the statistics certainly bear that

20   out, but the statistics don't tell the full story.  As the

21   quote goes, "There are lies, there are damn lies, and there's

22   statistics."  So we can't tell everything from statistics all

23   the time.

24        I think in 2007, the average term of incarceration

25   for a person convicted of a crime such as this was 97 months,

62

1    which, in this particular case, happens to be the bottom of

2    the guideline range when the Court takes into consideration

3    the various enhancements that are -- that are applied and

4    we've reviewed here today.

5            There's also, I believe, no dispute that this type of

6    offense is increasing.  There's increasing prosecution of

7    these offenses.  As I stated earlier in my questions to

8    Mr. Alerding, Congress believes that these offenses should be

9    dealt with severely, and this Court agrees with that

10   assessment.  It doesn't mean that the Court doesn't understand

11   that it has discretion, certainly.  The Court can vary when

12   it's appropriate.  But the Court feels in most of these type

13   cases, that a downward variance certainly isn't the

14   appropriate way to go.

15           Question becomes, when children are being abused and

16   exploited in this way, is the best response to slap the --

17   slap the defendant on the wrist.  And Mr. Alerding makes the

18   argument that a minimum term in this case of 60 months would

19   certainly not be a slap on the wrist, but the question is,

20   should the Court simply slap the person on the wrist and say,

21   don't do that again, or should the Court impose a punishment

22   that will provide real deterrence, not only for the defendant,

23   but for others that might be inclined to engage in similar

24   conduct.

25           Earlier in a case that I had, actually this week, I

63

1    stated that with respect to others that would be inclined to

2    diminish these particular offenses or impose very low

3    sentences for these offenses, I respectfully disagree with

4    those individuals that would take that approach.  I think that

5    approach reflects a fundamental misunderstanding of the crime

6    that's been committed and the need for punishment for this

7    type of offense.  The laws are intended to -- they're

8    certainly intended to eliminate exploitation of children by

9    increasing the deterrent effect for these offenses.

10          Looking at the 3553 factors.  Nature and the

11   circumstances of the offense, we've all talked about that

12   quite a bit.  These are terrible crimes.  This Court is not

13   required to view any images or listen to any videos or

14   anything of that nature in this case, but these -- these are

15   terrible images, children being exploited in the worst of all

16   possible ways; and this type of exploitation, as the victim

17   statement that was read earlier indicates, this offense

18   follows these children for the remainder of their lives.  They

19   never get away from it.

20          The defendant's history and characteristics are such,

21   he is an intelligent person, he is employable, he's able to

22   make a -- he can be a positive influence.  Hopefully, he'll be

23   able to reconcile matters with his family.  But the Court

24   knows that the problems that he finds, that he faces today,

25   are self-inflicted.  They're all things that he decided to do

64

1    for himself, or to himself, and he does have -- he does have

2    responsibility for his actions.

3            Now, the Court is to impose a sentence that is

4    sufficient but not greater than necessary to comply with the

5    purposes of 3553(a)(2).  And that includes a sentence to

6    reflect the seriousness of the offense, the need to promote

7    respect for the law, and to provide a just punishment for the

8    offense.  The Court believes that a variance would not serve

9    those purposes, a variance below the guideline range would not

10   serve those purposes.

11           Court also believes a sentence below the guideline

12   range would not provide sufficient deterrence, either general

13   deterrence or specific deterrence.  And the issue of general

14   deterrence is the idea that individuals that might be inclined

15   to engage in this type of conduct should know that if they are

16   prosecuted, they will be dealt with severely.  So the Court

17   believes that with respect to the issues of deterrence, that

18   it would be improper for the Court to impose a sentence below

19   the guideline range.

20           Issues of public protection the Court believes would

21   be best dealt with through a term of lifetime supervision with

22   the standard conditions that are often imposed by this Court.

23   Court also considers the need to provide the defendant with

24   needed educational or vocational training or medical care or

25   treatment or other corrective treatment.

1          And there are two areas here that I do want to focus

2     on.  One is the need for medical treatment that has been

3     brought out through Dr. Larson.  The second is the issue of

4     corrective treatment.  And that is psychological treatment,

5     counseling.  I believe the Bureau of Prisons' program

6     certainly can address that, as well as the issue that I

7     discussed earlier, and that is the life term of supervision

8     will also allow for treatment to be provided.

9          Now, there's one final factor that the Court would

10    like to mention, and that is the nature to avoid unwarranted

11    sentencing disparities among the defendants that are similarly

12    situated who have been found guilty of similar conduct.  In my

13    opinion -- well, first of all, this is an issue that's a

14    national issue.  The Court looks first at national disparity

15    issues, but can, within a particular case, consider other

16    issues of disparity.  So in this particular case, I believe

17    that to avoid any type of disparity in sentencing, that a

18    guideline sentence would certainly be appropriate.

19         The question is where within the guidelines should

20    the Court -- what penalty should be chosen from the

21    guidelines.  And I've thought a long time about this, about

22    the appropriate punishment.  The Court is concerned with

23    whether a sentence at the bottom of the guidelines would serve

24    all of the purposes that I've outlined, but I believe that in

25    light of the defendant's age and positive characteristics that

1    have been identified by counsel, that all of those factors can

2    be satisfied by a sentence at the bottom of the guideline

3    range.

4          Again, I do understand the arguments that Mr. Denney

5    has made.  Number of images, for example, is a factor that the

6    Court certainly has considered.  But in light of all the

7    information that has been provided by the parties to the

8    Court, I do believe that all of the sentencing factors, the

9    3553 factors, can be met by a sentence at the bottom of the

10   guideline range.  And the Court reaches that conclusion with

11   some reluctance, but that would be the conclusion of the

12   Court.

13         So having stated the reasons for the sentence that

14   will be imposed, let me announce the sentence formally at this

15   time.  It will be the sentence, pursuant to the Sentencing

16   Reform Act of 1984, as modified and amended by the decisions

17   in Booker and Fanfan, and I do believe that the following

18   sentence is sufficient but not greater than necessary to

19   comply with the purposes of Title 18, section 3553(a)(2).

20         Accordingly, it will be the judgment of the Court

21   that the defendant, Kenneth Lester Mullikin, Junior, will be

22   committed to the custody of the Bureau of Prisons for a term

23   of 97 months.  Upon release from imprisonment, the defendant

24   will be placed on supervised release for a life term.  Within

25   72 hours of release from the custody of the Bureau of Prisons,

1    he shall report in person to the Probation Office in the

2    district to which he is released.

3            While on supervised release, the defendant shall not

4    commit another federal, state, or local crime, shall comply

5    with the standard conditions that have been adopted by this

6    Court, as well as the following additional conditions:

7            He shall not possess a firearm, destructive device,

8    ammunition, or dangerous weapon.

9            And I'll also impose the following special

10   conditions:

11           He shall participate in a program for treatment of

12   mental health and sexual disorders and shall undergo sex

13   offender risk assessment, psychosexual evaluation, and/or

14   other evaluation as needed, be subject to periodic polygraph

15   examinations at the direction and discretion of the probation

16   officer, and shall follow the rules and regulations of the sex

17   offender treatment program as implemented by the Probation

18   Office.  He shall also abstain from the use of alcohol.

19           There will be a number of restrictions, including a

20   residence restriction.  And that is that his residence and

21   employment will be preapproved by the probation officer and in

22   compliance with state and local law.

23           There will be a restriction on contact with minors.

24   And that is the defendant shall not frequent, volunteer, or

25   work at places where children under the age of 18 congregate.

1    And that would include playgrounds, parks, day care centers,

2    public swimming pools, youth centers, video arcade facilities,

3    and other facilities of that nature.  And that would be unless

4    approved by the probation officer.  And also he shall have no

5    contact with any identifiable victims.

6           The defendant shall not associate or have verbal,

7    written, telephonic, or electronic communication with any

8    person under the age of 18 without the permission of the

9    United States Probation Office.  And this provision does not

10   encompass persons under the age of 18 such as ticket vendors,

11   cashiers, waitresses and the like with whom the defendant must

12   deal in order to obtain ordinary and usual commercial

13   services.

14          He shall not possess, view, listen to, or go to

15   locations where any form of pornography, sexually stimulating

16   performances, or sexually oriented material, items, or

17   services are available, and he shall not use -- I'm sorry,

18   shall not possess or use a device capable of creating pictures

19   or videos.

20          The defendant shall not rent or use a post office box

21   or storage facility.  He shall register as a sex offender as

22   prescribed by law.

23          And there will be computer restrictions.  And that is

24   the defendant shall not possess or use a computer or any

25   device with access to any on-line computer service at any

1    location, including place of employment, without the prior

2    written approval of the probation officer.  This includes any

3    Internet services or Internet service provider, bulletin board

4    system, or other private or public network or e-mail system.

5         The defendant shall consent to the United States

6    Probation Office conducting unannounced examinations of his

7    computer system and the internal and external storage devices,

8    which may include retrieval and copying of all memory or

9    hardware and software, and/or the removal of such systems for

10   the purposes of conducting a more thorough inspection.  And he

11   will be required to consent to having installed on his

12   computer any hardware or software to monitor his computer use

13   or prevent access to particular materials, and to consent to

14   periodic inspection of any such installed hardware or software

15   to ensure that it is functioning properly.

16        The defendant shall provide the United States

17   Probation Office with accurate information about his entire

18   computer system.  That's the software or hardware and any

19   internal or external storage devices, and passwords used by

20   him, and he will abide by all rules of the computer

21   restriction and monitoring program established in this

22   district.

23        The Court will impose a search condition.  And that

24   is, the defendant shall submit his person, residence, office,

25   vehicle, or any other property under his control to a search

1    conducted by the United States Probation Office at a

2    reasonable time and in a reasonable manner, based upon

3    reasonable suspicion of contraband or evidence of a violation

4    of the condition of release.  Failure to submit to a search

5    may be grounds for revocation and supervision.  And the

6    defendant shall inform any other residents that the premises

7    may be subject to a search pursuant to this condition.

8           The defendant shall be required to provide the

9    Probation Office with access to any requested financial

10   information.  However, based upon Mr. Mullikin's current

11   financial condition, the Court will waive the fine in this

12   matter.  However, he will be ordered to pay to the United

13   States a special assessment of $100, which will be due

14   immediately.

15          I will make a recommendation that Mr. Mullikin be

16   designated to a facility that's located closest to his home

17   for which he would qualify.  That, of course, would be subject

18   to the other recommendations made with respect to treatment

19   that the Court has already announced.

20          And he will be required to forfeit the items that are

21   listed in Count 7 of the indictment.  And that will be the

22   sentence of the Court.

23          Let me ask the parties at this time if there is any

24   objection to the sentence imposed by the Court?

25          MR. DENNEY:  No, Your Honor.

1      THE COURT:  Mr. Denney, do you have any objection to

2  any of these proceedings under United States v. Bostick?

3      MR. DENNEY:  No, Your Honor.

4      THE COURT:  And do you wish the Court to make any

5  additional findings to support the sentence that has been

6  imposed in the case?

7      MR. DENNEY:  No, Your Honor.

8      THE COURT:  All right.  Thank you.  Mr. Alerding, the

9  same three questions for you.  First, any objections other

10  than those previously stated?

11      MR. ALERDING:  No, sir.

12      THE COURT:  Any objection to any of the proceedings

13  that have been held in the case under United States v.

14  Bostick?

15      MR. ALERDING:  No, sir.

16      THE COURT:  And do you wish the Court to make any

17  additional findings to support the sentence that has been

18  announced?

19      MR. ALERDING:  Do not, sir.  We have a couple

20  housekeeping issues I guess we want to raise with the Court.

21      THE COURT:  Yes, sir.

22      MR. ALERDING:  I was not a party to the original plea

23  agreement, but it's my understanding that there was some items

24  that were seized that were either not contraband or not

25  forfeitable, I think like maybe a -- and apparently there was

72

1    some discussion between prior counsel and Mr. Bracke about

2    returning some of those things.  I think there was a computer

3    that belonged to his daughter, a laptop that had no contraband

4    on it, things of that nature.  I just wanted to make sure that

5    those could be released upon sentencing.

6           THE COURT:  All right.

7           MR. ALERDING:  I don't know what the Government has

8    to say about that, or if Mr. Denney is aware.

9           THE COURT:  Mr. Bracke is not here.  Mr. Denney, I'm

10    not sure if you're prepared to address it.

11           MR. DENNEY:  Judge, I think we can -- later, we can

12    consult with defense counsel on this issue, but I would point

13    out that in paragraph 9 of the plea agreement, defendant

14    agrees to forfeiture of all items listed in Count 7 of the

15    indictment.  That's required by the plea agreement.

16           THE COURT:  All right.  If you're not able to work

17    out that issue, Counsel, the items that are listed in Count 7

18    will be included in the judgment.  The forfeiture items will

19    be listed.  If the parties have any modification to that, of

20    course, you can certainly tender that to the Court.

21         I'm not going to ask the clerk to advise Mr. Mullikin

22    of any rights of appeal based upon the language that's

23    contained in paragraph 8 of the plea agreement; but in light

24    of the fact that there have been some motions made and the

25    Court has addressed those motions previously, I will note for

1    the record that in the event that either party believes that

2    there are issues that may be appealed and that are not subject

3    to the waiver, that any notice of appeal or direct appeal

4    would need to be filed within 14 calendar days of entry of the

5    judgment in the case.

6            I know the attorneys are aware of this, but the --

7    some of the time deadlines have changed following the

8    December 1st amendments to the Rules of Civil Procedure --

9    Criminal Procedure and the Rules of Appellate Procedure.

10   That's one of those rules that changed that time period from

11   10 days to 14 days, but it's calendar days, so we don't

12   have -- we don't exclude the intervening holidays or weekends

13   at this point, so 14 calendar days, and I would just note that

14   for the record.

15           MR. ALERDING:  Thank you, sir.  One other issue

16   Mr. Mullikin asked me to raise with the Court was, on the

17   issue of his medication, I know there was some testimony here

18   from Dr. Larson about the medication that he had prescribed to

19   him.  Apparently, there's been an issue out at -- and the

20   Boone County Jail issue may sort of be moot since he's going

21   to be in the custody of BOP very soon, but they had taken him

22   off of that medication.  I don't know if the Court's in a

23   position to order BOP to continue with that medication, or at

24   least to order that he be treated and prescribed whatever

25   medication the doctors at the facility find appropriate.  I

74

1      mean, he was asking to be put back on the exact same

2      medication, but if the Court's not comfortable making medical

3      judgments, I understand.

4              THE COURT:  My understanding is once Mr. Mullikin has

5      been designated to a facility, that that facility then will

6      review his medical records and make an appropriate

7      determination as to treatment plan, whether it be medication

8      and other types of treatment.  The Court can make a

9      recommendation to the Bureau of Prisons that it -- that it do

10     that, but it will happen in any event.  But the Court will

11     certainly include that as a recommendation, that he receive a

12     medical evaluation and any and all proper treatment.

13             I'm very leery of making specific recommendations to

14     the Bureau of Prisons because (1) I'm not a doctor and (2) the

15     Bureau of Prisons, of course, is not bound by that.  It's only

16     a recommendation of the Court.  But sometimes it gives the

17     parties the false impression that if I make a recommendation

18     and the Bureau of Prisons decides otherwise, then there's some

19     action that should be taken up here, when it really can't be

20     at that point.  It's not an issue, then, for this Court to

21     take up if BOP chooses medicine B as opposed to medicine A.

22             So I'm reluctant to do anything more than just make

23     the recommendation for continuing his evaluation and

24     treatment.

25             MR. ALERDING:  That would be it.  Thank you, sir.

1          THE COURT:  All right.  Thank you, Counsel.  Are

2    there any other issues that need to be taken up at this point?

3          MR. DENNEY:  Just very briefly, Judge.  I apologize.

4    I know we've had a long session this morning.

5          Typically, this issue is taken care of in the plea

6    agreement, but apparently this plea agreement was drafted

7    before this became our standard practice.  And that is the sex

8    offender and notification requirements.  If the Court would

9    permit me, I would read that to the defendant now, since it's

10   not a plea agreement, as is our standard practice.

11         THE COURT:  That would be fine.

12         MR. DENNEY:  Let the record reflect the defendant,

13   Mr. Mullikin, is present here and within the sound of my

14   voice and appears to be understanding.

15         Mr. Mullikin, under federal law, you must register as

16   a sex offender for life.  You have to keep that registration

17   current in each of the following jurisdictions:  Where you

18   reside, where you work, where you go to school.

19         You understand that the requirements for registration

20   include providing your name, residence address, and the names

21   and addresses of any places you are or will be an employee or

22   a student, among other information.

23         The requirement to keep registration current includes

24   informing at least one jurisdiction in which you reside, are

25   an employee, or a student, not later than three business days

1   after any change in your name, residence, employment, or

2   student status.

3         Failure to comply with these obligations subjects you

4   to prosecution, failure to register under federal law, which

5   is Title 18, United States Code, section 250.  And that's a

6   felony punishable by imprisonment.

7         Thank you, Your Honor.

8         THE COURT:  All right.  Thank you, Counsel.

9   Mr. Denney, if you would please provide a copy of the

10  notification that has been provided, and you can place that in

11  the record as well.

12        MR. DENNEY:  I don't have a clean copy, but if I can

13  do that after court.

14        THE COURT:  You may.  You can just file it as a

15  notice that information has been provided.

16        MR. DENNEY:  Thank you, Your Honor.

17        THE COURT:  All right.  Madam Clerk, let me provide

18  you with the plea agreement.  Mr. Alerding, any further

19  matters that need to be taken up?

20        MR. ALERDING:  Judge, Mr. Mullikin has advised me

21  that, although he did waive all of his appeals, I guess there

22  is a new issue, the issue of whether he should have been

23  permitted to withdraw his guilty plea.  He does wish to

24  actually file a notice of appeal.  Since we're here, I wanted

25  to inform the clerk -- or would you rather me file it on my

77

1    own?

2           THE COURT:  If you would please do that.

3           MR. ALERDING:  I'll take care of it, sir.

4           THE COURT:  You would not be relieved as counsel in

5    the case until the notice of appeal has been filed, but --

6           MR. ALERDING:  I'll take care of it and then deal

7    with it.  I'll file it.

8           THE COURT:  That's the reason I was trying to be

9    careful to point out that there were other proceedings.  There

10   was the motion that was filed that the Court denied.  And that

11   would be for the Sixth Circuit to determine whether that would

12   be subject to the wayward provision or not subject to the

13   wayward provision.  I just want to make sure that the parties

14   were aware of the fact that the time limits have changed for

15   filing any notice of appeal that either side may think would

16   be appropriate.  So that's the reason I pointed that out.

17          MR. ALERDING:  Thank you, sir.  I'll take care of it.

18          THE COURT:  All right.  Thank you.

19          MR. ALERDING:  Nothing further from the defense.

20          THE COURT:  Thank you.  If there's nothing else to

21   take up, we will be in recess until court in course.

22          (Proceedings concluded at 10:55 a.m.)

23                        -  -  -

24

25

C E R T I F I C A T E

     I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.


_\s\ Joan Lampke Averdick_____         June 14, 2010     __
JOAN LAMPKE AVERDICK, RMR-CRR       Date of Certification
Official Court Reporter

INDEX

DEFENSE WITNESSES

EDWARD LARSON, M.D.
    Direct Examination......................... Page  7
    Cross-examination.......................... Page 15

EDWARD CONNOR, Psy.D.
    Direct Examination......................... Page 17
    Cross-examination.......................... Page 29
    Redirect Examination....................... Page 37


                    -  -  -


GOVERNMENT EXHIBITS                              ADMITTED

Exhibit No. 1, Article written by Bourke & Hernandez
    Admitted................................... Page 37


                    -  -  -